## THE JOSEPH W. GOULD.

*(District Court, W. D. Pennsylvania.* February 4, 1884.)

1. COLLISION—NEGLIGENCE—EVIDENCE.
    In a case of collision the libelant must show the alleged negligence by a fair preponderance of the evidence.
2. SAME—RUNNING ON OHIO RIVER.
    Running on the Ohio river in a fog is not negligence *per se.*
3. SAME—MUTUAL FAULT—APPORTIONMENT OF DAMAGES.
    Boats so running should observe great care and caution ; but, this being done, the court will not apportion the damages in case of a collision upon the ground that the colliding boats were both in fault in running in a fog. Having vol-untarily encountered the hazard of the navigation the loss must lie where it falls in the absence of proof of negligence.

In Admiralty.

*Morton Hunter*, for libelants.

*D. T. Watson* and *F. F. Sneathen*, for respondents.

ACHESON, J. This a suit by the owners of the steam-propellor Stella McCloskey against the steam tow-boat Joseph W. Gould, to recover damages sustained by the first-named vessel in a collision on the morning of February 2, 1881. At the time of the occurrence both boats were proceeding on short trips down the Ohio river. They left the Pittsburgh wharf at nearly the same time, between 9 and 10 o'clock A. M., the McCloskey turning out first and being somewhat in advance of the Gould. When the latter was at the Point bridge the former was at Painter's mill, or a little above. Painter's mill is about 460 yards, and the place of collision is some 840 yards, below the bridge. When the boats started out there was a "frost fog" upon the surface of the river above the bridge, rising a few feet only above the water, and not interfering with navigation. But at or about Painter's mill the boats encountered a dense fog which came out of Saw-Mill run, and it was while they were in this "fog-bank," as the witnesses term it, and hidden from each other, that the collision occured.

The boats were proceeding to points on opposite sides of the river. The destination of the Stella McCloskey was Manchester, on the north side, and therefore it was necessary for her to cross the river, following the channel, which here runs in a quartering direction from the south towards the north shore. She was in the act of crossing when the Gould ran against her starboard side, about one-third forward of her stern. The effect of the collision was to upset the Stella McCloskey or overturn her on her larboard side. Her pilot says she was "shoved over." She sank almost instantly. The saddest thing connected with the disaster was the drowning of her fireman, William Salt. The pilot and engineer, the only other persons upon her, were thrown or jumped into the river, and were picked up by the Gould. So sudden was the mishap that the pilot of the Stella McCloskey did not see the Gould until he was in the water, and the first notice her engineer had of the impending calamity was when he saw "the cabin break, and the nosing of a boat at the glass sky-light just where the cabin broke in." The pilot of the Gould testifies that when he discovered the Stella McCloskey she was not further away than 35 to 40 feet. He states that he instantly rang his backing bell, and the proof is that the order to back was promptly obeyed. Indeed, the engineer of the Stella McCloskey, speaking, as I understand him, of what he observed immediately after the collision, says: "When I came out of the cabin or engine room I suppose the Gould was about 25 or 30 feet away from us and abreast of us. *She had been backing*, and her wheel was just stopping." Later on that day the sunken boat was raised by crane-boats, the Gould staying by and assisting. The injuries to the Stella McCloskey, as the direct result of the collision, were found to be these,

viz: About three feet of her nosing, which was two or two and a half inches thick, was torn off the guard, but the latter was not broken; and there was a break at the corner of the cabin, a foot below the roof, eight or ten inches wide, which, a witness states, "appeared to have been made by a sliding lick from the guard of another boat." The evidence does not disclose the dimensions of either vessel, but it appears that the Stella McCloskey was of considerably lighter burden than the other, and was much the smaller boat. She was originally built for a "pleasure boat," but had been changed into a regular passenger boat.

The seventh rule, for the government of pilots on the western rivers, provides that "when a steamer is running in a fog or thick weather, it shall be the duty of the pilot to sound his steam-whistle at intervals not exceeding one minute." Each of the pilots testifies that he obeyed this rule, and each is corroborated, to some extent, by other witnesses. The testimony, corroborative of the pilot of the Gould, is especially strong, and, in part, comes from witnesses who were on shore. True, the witnesses who were on the respective boats say they did not hear any whistle but their own. The explanation of this, however, may possibly be that the pilot-houses and engine-rooms were closed, the day being extremely cold, and that the whistles of the two boats were nearly simultaneous.

In respect to the speed of the Gould, the testimony of her pilot is that she proceeded under a slow bell, and with great caution. To the same effect testifies the engineer; and of this there is some other direct corroborative testimony. Moreover, the circumstantial evidence that the Gould was so running is very strong. The wounds which the Stella McCloskey received indicate that the Gould had little headway. And then, again, the witnesses on both sides all say that when the boats came together they felt no jar, and heard no crash to denote a collision. There is no direct evidence in the case that the Gould was running at an improper rate of speed. Mr. Neeld, indeed, testifies that a boat leaving the Point bridge at the same time another leaves Painter's mill, and overtaking the latter boat at the place of this collision, would have to run twice as fast; and the pilot of the Gould states that she ran 2,950 feet while the Stella McCloskey ran 1,650 feet; but this does not necessarily imply undue speed on the part of the Gould, and much less would it justify such conclusion in the face of the positive testimony to the contrary.

In a case of collision the libelant must show the alleged negligence by a fair preponderance of the evidence; otherwise the libel will be dismissed. *Butterfield* v. *Boyd*, 4 Blatchf. 356; *The Albert Mason*, 2 Fed. Rep. 821; *The Edwin H. Webster*, 18 Fed. Rep. 724. Applying this rule here, there must be a decree dismissing the libel unless, indeed, the Gould is to be adjudged guilty of negligence in running at all in the fog. But a charge of culpability in that regard would come with an ill-grace from the Stella McCloskey, for she led the way into

the obscurity of the fog, and certainly was equally blameworthy with the Gould, if either herein were censurable. But running in a fog is not negligence *per se*. The above-quoted rule, prescribed for the government of pilots, regulates such running, and, by implication, sanctions it. True, great care and caution should be observed under such circumstances; but, this being done, the court, in case of a collision, will not apportion the damages upon the ground that the colliding boats were both in fault in running in a fog. *The Sylph*, 4 Blatchf. 24. Having voluntarily encountered the hazard of the navigation, the loss must lie where it falls, in the absence of proof of negligence. Id.

Let a decree be drawn dismissing the libel, with costs.