MONONGAHELA RIVER CONSOL. COAL & COKE CO. v. RIVER & RAIL STORAGE CO.

(Circuit Court of Appeals, Sixth Circuit.   January 6, 1914.)

No. 2,389.

WHARVES (§ 22*)—INJURY TO WHARF BY COAL FLEET—NEGLIGENT NAVIGA-
TION—QUESTION FOR JURY.

Defendant operated a fleet of heavily loaded coal barges down the Mississippi river. There were 28 of them made up in the form of a raft, 775 feet long and 210 feet wide, with a steamer behind. When 6 miles above Memphis in the early morning, the fleet was met by a tug to assist in guiding the front end while passing the city and bridge. As it passed the bend in the river immediately above the city, it passed into heavy fog and smoke so thick that practically nothing could be seen. The current was running at a speed of 7 or 8 miles, and the fleet could not then be stopped, and in attempting to navigate past the city it ran into and injured plaintiff's wharf and wharf boat. There were places above, one within a mile or so, where the fleet could have been tied up and held or separated, and taken past the city in sections. The towing vessels could not hold the fleet, but could guide it in clear weather. The condition of fog and smoke on the city front was not unusual at that season. Held, that it could not be said as matter of law that defendant exercised rea-
sonable care and prudence in navigating its unwieldy tow, and that the case was properly submitted to the jury.

[Ed. Note.—For other cases, see Wharves, Cent. Dig. § 7; Dec. Dig. § 22.*]

In Error to the District Court of the United States for the Western District of Tennessee; John E. McCall, Judge.

Action at law by the River & Rail Storage Company against the Monongahela River Consolidated Coal & Coke Company. Judgment for plaintiff, and defendant brings error. Affirmed.

The River & Rail Storage Company owned a wharf structure and wharf boat upon the river front, in Memphis. The coal and coke company (hereinafter called "defendant") was engaged in transporting coal down the river, past the city. About 6 in the morning, on February 14, 1911, the stern wheel steamer Pittsburgh, belonging to the coal and coke company, and bringing down the river a fleet of coal barges, had reached a point about six miles above the city. There were 28 of these barges, deep laden, lashed together and making a rectangular raft 775 feet long and 210 feet wide. It was being handled in the customary river manner, viz., the bow of the steamer was fast to the stern of the raft, so that reversing the steamer's wheel would tend to hold the barges against the current, and so that the course of the raft in the current could be somewhat, although imperfectly, directed. Whenever such a fleet was to go under a bridge or through a place where the steamer at the stern could not sufficiently control the course, it was customary to take on a small steamer or tug at the bow of the raft. This tug would lie crosswise of the current, and, by going ahead or astern, would swing the nose of the raft toward one

---

or the other bank. According to this custom, such a tug, the Jones, at about 4:30 in the morning, went up the river and met the coal fleet at the point stated. The captain of the Pittsburgh inquired from the captain of the Jones regarding weather conditions at Memphis, and was told that they were all right; as they had been when the tug left the city. Accordingly, the tug made fast, in the usual way, and they proceeded down the river. The city of Memphis lies upon the outer side of, and just below, a great bend in the river, and that part of the river immediately in front of the city and called the Memphis Harbor is not visible from upstream until the descending boat rounds the curve and is practically in the harbor. When the Pittsburgh and its coal fleet had passed the "Jim Lee Light," which is about a mile above where the river swings into the harbor, it was noticed that there were fog and smoke ahead, and, on rounding the last point, these became so thick that the captains could see practically nothing. This was about 8 o'clock.

The current was running seven or eight miles an hour. There was no system of anchors in use, or perhaps possible, that would hold this coal fleet against that current. The reversed wheel of the Pittsburgh could only slightly retard its progress. It was impossible to tie up to the bank, unless a special landing place had been provided and equipped. The proofs indicated that such a landing did exist at one or more places between the six-mile point where the tug met the fleet and the "Jim Lee Light"; but below the Jim Lee Light there was no such landing. Accordingly, after the fog bank was entered, there was nothing for the Pittsburgh and its fleet to do, except to come on blindly, avoiding obstacles as best they could. The channel naturally lies upon the outer side of the course, up against the city bank. The fleet was carried along this channel, swept into the Memphis bank, and collided with and injured a wharf structure 2,000 feet up the river from the River & Rail Storage Company wharf. Using their best efforts, both the Pittsburgh and the Jones were unable to get the fleet away from the bank, and it came on down and struck and damaged the River & Rail Company's wharf boat and structure. For such damage, that company brought this action, alleging common law negligence, and recovered the judgment to reverse which this writ of error is brought.

It is to be taken as a further conceded fact, from defendant's standpoint, that the power accompanying the raft was sufficient, in clear weather, to control and guide it safely past the city and under the bridge, just below, but was insufficient to hold its speed down to that slow rate which, in a fog, would be essential to safety.

C. L. Marsilliot and Walter C. Chandler, both of Memphis, Tenn., for plaintiff in error.

C. H. Trimble, of Memphis, Tenn., for defendant in error.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). In reciting these facts, we have put the defendant's construction upon every substantial matter of dispute, because defendant's main contention is that there was no evidence of its negligence sufficient to go to the jury, and because we think that the undisputed facts, as thus recited and as thus colored in defendant's favor, make a case clearly tending to show a right of action.

There is no dispute between counsel as to the applicable rule of law. All agree that defendant was bound to use reasonable care to navigate its coal fleet past the city without injury to the shipping lying there, or to wharves or structures along the bank, and all agree that such care and caution as were reasonably prudent, under all the existing circumstances, form the ultimate measure of liability.

We think it obvious, beyond the necessity for elaboration, that to

permit this great raft, aptly described by counsel as "3½ acres of coal," to tumble through the harbor, wholly out of control, so that only good luck could preserve the shipping and wharves from destruction— that this would be actionable negligence, unless the reasonable necessities of prudent navigation at this point in the river justified the conduct which brought about this result, or (another form of saying the same thing) unless the result followed from conditions which could not have been reasonably anticipated and guarded against.

If the fog and smoke which had settled down this morning had been an extraordinary and unprecedented condition, we would have a different question; for it cannot be required of navigators that they should guard against all possible abnormal and unusual conditions. The proof tended to show that there was a great amount of smoke from the city factories; and that, with the wind from a certain direction and with the atmosphere in a certain foggy condition, the high bluffs on which the city is situated would cause the smoke and fog to drop down in the harbor, as in a pocket, and that it was not unprecedented —indeed, not uncommon—to encounter, at about this point, banks of fog and smoke, nearly, if not quite, as bad as this. It is not to be implied that such a coal fleet should always be able to tie up when about to enter a fog bank, or even that it should always have means to stop when finding such a fog bank at a place where one may be anticipated. In many parts of the river, the danger from proceeding somewhat blindly would be small; but it is not too much to say that it may be negligence for a coal fleet, under very imperfect control, to proceed into such a fog bank just above a city like Memphis, where the conditions are such as have been described, and where the danger of great damage is imminent. That such conduct is, as matter of law, not negligent, cannot be said, unless there was no known and reasonable precaution which might have been adopted and which would have avoided or tended to avoid the damage. Three such precautions are suggested by this record. The first is that additional steamboat power should have been held in reserve for such emergency, subject to be summoned and available for instant use. It is not entirely clear that this remedy was feasible or would have been efficient, and it does not need further consideration. The second precaution which it is said might have been taken, is the providing of a suitable tying up station on the Arkansas bank, immediately above the city, instead of some distance above. The third is that the coal fleet might have been "double tripped" past the city and the bridge; that is, that one half of the barges might have been left at an upper landing station while the steamer and the tug brought down the other half and then returned for the remainder. The last seems to have been the familiar and common expedient used at all points where it was thought that the full-sized fleet would be dangerously unmanageable. It was not employed on this occasion only because, when the fog came on, the fleet had passed the last existing station where it could be done; and defendant asks us to say, in substance, that it can avoid liability by so locating its landing stations that a disaster like this becomes unavoidable. We cannot approve that doctrine. The peculiar and well-known physical river and harbor conditions at this point,

coupled with the known fact that the harbor might be shut in by a fog bank which could not be seen until the descending boat was almost upon it, amply justified submitting to the jury the question of defendant's negligence upon either of two theories: That it should have established and maintained an additional landing place comparatively close above the city where a fleet could stop after harbor conditions could be seen, or, at least, close enough so that the fleet could receive recent and accurate information before it was too late to stop; or that, lacking such further landing place, the fleet should have tied up at the lowest existing one and "double tripped" past the city or obtained knowledge of conditions at that time, instead of proceeding on the strength of a report three hours old.

We are cited to several cases (note [1]) in which it has been held that it was not negligent to navigate on the Ohio or Mississippi in a fog. It is not necessary to review these cases. Each depends on its own facts and is vitally dissimilar to the instant case in what we have considered the controlling facts.

We find no prejudicial error in the assignments relating to the admission or rejection of evidence.

The defendant presented a special request which required the jury to find a verdict for defendant, if it found certain recited conditions tending to show due care. This request was faulty because it undertook to make a verdict for defendant follow from a recital of only a part of the existing situation; it would have excluded from the jury each of the considerations which we have just stated as furnishing support for a verdict for plaintiff. It was not error to refuse the request.

The judgment is affirmed, with costs.

---

[1] Bray v. Monongahela Co. (C. C. A. 3) 161 Fed. 277, 88 C. C. A. 323; Kenova Co. v. Monongahela Co., 56 W. Va. 70, 48 S. E. 844; The Porter, Fed. Cas. No. 11,285; The Joseph W. Gould (D. C.) 19 Fed. 785.

